IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MICHAEL OSEI                                         :
        Plaintiff,

     v.                                             :

TEMPLE UNIVERSITY OF THE
COMMONWEALTH SYSTEM                                  :
OF HIGHER EDUCATION; DR. ANNE
WEAVER HART, individually and in her
official capacity as President of Temple             :
University; BRIAN C. FOLEY, individually
and in his official capacity as Vice Chair,
University Disciplinary Committee,                   :
Temple University; DR. KEITH GUMERY,                                    CIVIL ACTION
individually and in his official capacity as                           NO. 10-2042
Vice Chair, University Disciplinary Committee,      :
Temple University; ANDREA C. SEISS,
individually and in her official capacity as
Code Administrator, University Disciplinary         :
Committee, Temple University; DR. MIA K.
LUEHRMANN, individually and in her
official capacity as Associate Dean of              :
Undergraduate Studies, College of Science
& Technology, Temple University; DR.
ROBERT J. LEVIS, individually and in                :
his official capacity as Chairman and Professor,
Department of Chemistry, Temple University;
DR. GRANT KROW, individually and in his             :
official capacity as Professor of Chemistry,
Department of Chemistry, Temple University
        Defendants.                                :

**<u>MEMORANDUM</u>**

**Jones, J.**                                              **September 30, 2011**


1

## I.     Introduction

The within action stems from Plaintiff Michael Osei's disciplinary suspension from a graduate studies program at Defendant Temple University's institution in Philadelphia, Pennsylvania.  After exhausting all internal remedies within the University, Plaintiff filed a *pro se* appeal to the Commonwealth Court of Pennsylvania on April 12, 2010.  On April 21, 2010, the Commonwealth Court *sua sponte* transferred the matter to the Philadelphia Court of Common Pleas, based upon lack of jurisdiction over Temple University.  One week later, Plaintiff formally withdrew his appeal and subsequently filed the instant action on May 5, 2010, naming as Defendants: Temple University of the Commonwealth System of Higher Education; Dr. Mia K. Luehrmann; Andrea C. Seiss; Dr. Robert J. Levis; and Dr. Grant Krow.  Said Defendants filed a Motion to Dismiss and in response thereto, Plaintiff sought and obtained leave of Court to file a counseled Amended Complaint, which he did on December 1, 2010.  Plaintiff's Amended Complaint contained two additional defendants: Brian C. Foley and Dr. Keith Gumery. All Defendants filed the instant Motion to Dismiss Plaintiff's Amended Complaint.  Plaintiff has responded to this Motion and the matter is now ripe for disposition.  For the reasons set forth herein, Defendants' Motion will be granted.

## II.     Factual Background[1]

Plaintiff is originally from the Republic of Ghana in West Africa and his first language is Ghana Twi of the Akan (Asante) tribe.  (Am. Compl. ¶ 12)  In 2003, after obtaining a visa from

---

[1]  Defendants have noted that for purposes of the instant Motion only, they will accept the material allegations of Plaintiff's Amended Complaint as true.  (Mot. Dismiss 2 n.2)  This Court also notes that the extensive factual history which follows is necessary in order to adequately address Plaintiff's claims.

government officials in Ghana, Plaintiff immigrated to the United States for the purpose of attending Temple University. (Am. Compl. ¶ 13) He acquired sufficient proficiency in English to attend classes conducted in English, and subsequently graduated with a Bachelor of Science in Biology in 2006. (Am. Compl. ¶ 14)  In  pursuance of his Healthcare Management degree, Plaintiff enrolled in Defendant Dr. Krow's Organic Chemistry course in the Fall of 2009. (Am. Compl. ¶ 17) Said course is a prerequisite for most healthcare professional school admissions. (Am. Compl. ¶ 18)  On December 14, 2009, Plaintiff took the final examination for Dr. Krow's course and ultimately received a grade of "C" for the semester, which was entered by the University Registrar's Office. (Am. Compl. ¶ 19)

Plaintiff felt he has been graded unfairly by Dr. Krow and sought to rectify the situation in accordance with Temple University's *Student Code of Conduct and Policy on Student and Faculty Academic Rights and Responsibilities*, which encourages students to first discuss their concerns with their instructor and if that does not resolve the matter, make an informal complaint to the Student Ombudsperson (Student Ambassador) for the appropriate School or College. (Am. Compl. ¶ 20)  Therefore, Plaintiff decided to communicate with Dr. Krow via e-mail to attempt to resolve the Organic Chemistry grade dispute. (Am. Compl. ¶ 21)

### Grievances About the Grade

On December 16, 2009, Plaintiff sent his first e-mail to Dr. Krow, which he titled "Grade details." (Am. Compl. ¶ 22)   In the e-mail, Plaintiff requested the details of all the scores upon which his final grade was based, as well as a copy of his graded final exam. (Am. Compl. ¶ 22) Because Plaintiff did not feel that Dr. Krow responded adequately to his e-mailed request, he sent two subsequent, general "mass" e-mails via Temple University's portal system to all students enrolled in Dr. Krow's Organic Chemistry course. (Am. Compl. ¶¶ 23-24)  The e-mails were

entitled "Important: Support Joint Complaints about Orgo 2202 with Dr. Krow" and it was Plaintiff's belief that Dr. Krow had read same. (Am. Compl. ¶¶ 23-25)  After receiving positive responses from the students who had taken Dr. Krow's course, Plaintiff sent another e-mail to the entire Organic Chemistry class and to all the users of the portal system, which he entitled "Refuse to change career goals/major because of Dr. Krow and his words. There are guaranteed ways to still get into Med. School. I will show you."  (Am. Compl. ¶¶ 26- 27) Plaintiff avers that as a user of the portal system, Dr. Krow also read this mass e-mail.  (Am. Compl. ¶ 28)

On December 20, 2009, Plaintiff sent another e-mail directly to Dr. Krow entitled "Appointment to see final exam," in which he again sought the details of all scores upon which his grade was based, as well as a copy of his final examination.  (Am. Compl. ¶ 29)  The final three paragraphs of the e-mail read as follows:

> If my final grade was not a genuine or fair grade, and the examinations you gave up was [sic] rather honors exams when this class was not an honors class, **It will be a curse against your life and family forever. I am serious!** You are free of [sic] you make amends for everyone's grade, you are also free if the grades were not motivated by your jealousies and presuppositions.
> I will not let you get away with this! If in the past you had gotten away with such thin ds [sic], this will be different for you. You had an encounter with OSEI this time. Let me know when I can see my final exam.
>
> Michael

(Am. Compl. ¶ 30)(emphasis in original)

Again, Plaintiff felt Dr. Krow did not respond adequately to his request, so on December 22, 2009, he sent his third e-mail to Dr. Krow, entitled "I have NO PLACE for your ego in this, so cooperate," which stated the following:

> I still have not heard from you about when I can look at my final exam in the meantime.
> I have no place for your ego when my tuition money and grade is

involved. I can not let you do anything and get away with it.

I want full accountability and transparency for how the minitest and group work factored into the final grading as well. You wasted our time with a last minitests [sic] which you considered to ne [sic] 'noodles' when a whole chapter on amino acids was not completed.

I could discern through all your soliloquys [sic] and pantomimes to me. This grade was intentional and unfair. I [sic] does not hurt me. I just want justice on you physically and spiritually.

Your game is over! Mine begins. You played with the wrong person this time.

Cooperate to prevent things from escalating.

This is my last email requesting to see how my final exam was graded and to have it back.

(Am. Compl. ¶¶ 31-32)

Dr. Krow responded to the above quoted e-mail by explaining that he would be available when the University reopened in January, at which time, Dr. Krow, Plaintiff, and Dr. Levis could meet to discuss Plaintiff's grade grievance. (Am. Compl. ¶ 33) Upon receiving Dr. Krow's response, Plaintiff sent the following e-mail:

I was not looking for mu [sic] exam to be reviewed in January 2010[;] I want the review right now. temple [sic] was officially open this week. You graded and posted final grades rightaway, [sic] yet you are not available to account for your discrepancies right now? I cannot accept this. Your official turnaround time was very poor. You have caused a delay which I will charge you for. The review will be done in a different setting, perhaps in a court of law with my attorneys if I decide to sue you. At that time you can choose to bring Dr. Levis along with you, without my appointment, I am not interested in booking an appointment with him for the review.

You still owe me full accountability for how the group work/minitests factored into the final grades.

Your pointless minitests prevented us from finishing the course syllabus. Further, you still owe me my final exam paper which you have given no legitimate reason to keep. I will ask you to produce it in a different setting.

Marl [sic] my words: The year 2010 will not start well for you.

(Am. Compl. ¶ 34)

Dr. Krow reported receipt of Plaintiff's e-mails to Dr. Levis, who was the Chairperson of Temple's Chemistry Department, and to the Campus Police. (Am. Compl. ¶ 35; Mot. Dismiss 2-3) On December 23, 2010, Plaintiff received telephone calls and voicemail messages from Temple University Campus Police headquarters, as well as a visit to his residence by Detective Agoi Ombima while he was absent. (Am. Compl. ¶¶ 35-36) After hearing the voicemail message left by the Temple University Campus Police, Plaintiff contacted their headquarters and spoke with Detective Ombima, who advised Plaintiff to stop e-mailing Dr. Krow. (Am. Compl. ¶¶ 37-38; Mot. Dismiss 3) Detective Ombima also informed Plaintiff that Dr. Levis would contact him to resolve the matter. (Am. Compl. ¶ 38; Mot. Dismiss 3)

On December 24, 2010, after having exhausted all informal attempts to resolve the grade dispute with Dr. Krow, Plaintiff sent an e-mail to Joshua Puricelli, Student Ambassador / Ombudsperson for the College of Science and Technology, in an attempt to file a formal grievance. (Am. Compl. ¶ 41) Additionally, on January 7, 2010, Plaintiff met with Dr. Levis and Dr. Strongin (Vice Chair of Temple University's Chemistry Department), to possibly resolve his grade dispute. (Am. Compl. ¶ 43) Dr. Krow did not attend that meeting but Dr. Levis did make reference to his knowledge of "threatening" e-mails that Plaintiff had sent to Dr. Krow. (Am. Compl. ¶ 44) Dr. Levis's statements apparently prompted Plaintiff to visit the Temple University Campus Police headquarters and personally inquire about the e-mail situation, at which time he was informed that it was a "non-criminal" situation that did not involve charges being filed against him, but that a disciplinary hearing would be held by the Disciplinary Committee of Temple University's Office of Student Conduct and Community Standards. (Am. Compl. ¶ 45)

After being advised that his grievance and joint complaint had been delegated to Dr. Mia

K. Luehrmann, Plaintiff contacted Dr. Luehrmann by e-mail on January 10, 2010 and learned that she had not taken any action on his formal grievances, but rather "placed them on hold" due to pending University Disciplinary Committee proceedings. (Am. Compl. ¶¶ 46-48) Two days later, Plaintiff received an e-mail from the University Disciplinary Committee and Office of Student Conduct and Community Standards ("UDC/OSCCS"), advising him that he had been charged with violating the Temple University Student Code of Conduct ("Student Code") and instructing him to read the attached "Notice of Disciplinary Action," which was dated January 8, 2010. (Am. Compl. ¶ 49; Mot. Dismiss 3)

The "Code Violation" section of the Notice indicated that Plaintiff was being charged with a violation of "Section 3," which provides for "[a]ny act or threat of intimidation or physical violence toward another person including actual or threatened assault or battery." (Am. Compl. ¶ 50; Mot. Dismiss n 3) The "Specifications" section of the Notice stated:

> Temple Student Michael Osei sent what was believed to be threatening emails to Dr. Grant Krow in reference to receiving a poor grade. In an email sent by Osei to Krow dated December 22, 2009, "This grade was intentional an unfair. It does not hurt me. I just want justice on you physically and spiritually. Your game is over! Mine begins. You played with the wrong person this time. Cooperate to prevent things from escalating."

(Am. Compl. ¶ 51)

On January 14, 2010, Plaintiff attended a pre-hearing meeting with Dennesha Brown, Program Coordinator of the University's Student Conduct Board ("SCB"), to discuss the disciplinary proceeding. (Am. Compl. ¶ 52) On January 28, 2010, Plaintiff received another e-mail from the SCB entitled, "Office of Student Conduct: Notice of Hearing," which advised him that his Student Conduct Hearing was scheduled for February 3, 2010 at 2:00 p.m., and that Professor Keith Gumery would be the Chair of the hearing. The Notice also stated that the

University planned to call Dr. Krow, Dr. Levis, and Detective Ombima as witnesses. (Am. Compl. ¶¶ 53-55)

The day before the hearing, Plaintiff received an e-mail from Defendant Brian C. Foley, Program Coordinator of "UDC/OSCCS," indicating that Dr. Luehrmann, Associate Dean of Undergraduate Studies at the College of Science and Technology, would also be called as a witness for the University. (Am. Compl. ¶ 56)  Additionally, prior to commencement of the hearing,  Mr. Foley handed Plaintiff copies of two other e-mails which the University believed contained threats from Plaintiff and which they intended to present as exhibits during the hearing. (Am. Compl. ¶ 58; Mot. Dismiss 4)  Also prior to commencement of the hearing, Plaintiff was informed that Dr. Krow would not be attending the hearing. (Am. Compl. ¶ 59)

### Student Conduct Hearing ("The Hearing")

Plaintiff attended the hearing on February 3, 2010 with Attorney Trevan Borum. (Am. Compl. ¶ 57; Mot. Dismiss 4)  During the hearing, Dr. Levis read Plaintiff's e-mail to Dr. Krow, entitled, " I have NO PLACE for your ego in this, so cooperate."  (Am. Compl. ¶60)  Both Dr. Levis and Dr. Leuhrmann testified that Dr. Krow felt "threatened" after reading the e-mail.  (Am. Compl. ¶ 60; Mot. Dismiss 4) Dr. Levis further testified that he was advised by Dr. Luehrmann that "we've had this [sic] similar sorts of incidents or interactions between Mr. Osei and, uh, his General Chemistry lecturer, his General Chemistry laboratory instructor, uh, last year."  (Am. Compl. 61)

With further regard to the "NO PLACE" e-mail, Dr. Luehrmann testified that Dr. Krow "was worried about what to do" and that Dr. Krow was "a little spooked by . . . by even the first e-mail."  (Am. Compl. ¶¶ 62-63)  Additionally,  Dr. Luehrmann testified that it was Dr. Krow who reminded her that "this same student had some issues with, with another faculty member in

Chemistry, um. [sic] at which point I, I, I did a little bit of, of, um, checking and, and confirming and making sure of what the scope of the things was."[2]  (Am. Compl. ¶ 64)

Temple's final witness, Detective Ombima, testified that he advised Plaintiff about the need for a disciplinary hearing and that "he needed to make sure that in the future when he uses certain words that he has to understand that when we send emails, the nature of the emails can often be misconstrued if you're not going to say these things personally.  (Am. Compl. ¶¶ 67-68; Mot. Dismiss 4)  When asked to compare Plaintiff's e-mails to others of which he had been made aware, Detective Ombima responded, "I've seen worse," noting that there were "implied things" in Plaintiff's e-mails for which there was room for "interpretation."  (Am. Compl. ¶ 69)

During Plaintiff's opportunity to speak, he apologized for the way Dr. Krow had interpreted his e-mails and attempted to explain his intention behind the words which the panel found troublesome.  (Am. Compl. ¶72; Mot. Dismiss 4)   In addition, Plaintiff apologized for his flawed use of English, explaining that he learned English while at Temple with a tutor and was still trying to master the language.  (Am. Compl. ¶ 73) Plaintiff also submitted three character letters; one written by the senior pastor of a church in Philadelphia and two written by Temple faculty members.  (Am. Compl. ¶ 73)

After the witnesses were presented, the panel took a recess and upon reconvening, announced their oral decision that Plaintiff had violated Section 3 of the Code by sending what were deemed to be "threatening" e-mails to Dr. Krow.  (Am. Compl. ¶ 75; Mot. Dismiss 5)

---

[2]  Dr. Luehrmann's reference to prior "incidents" and "interactions" with Plaintiff referred to a formal grievance Plaintiff had presented to Drs. Luehrmann and Levis in January, 2009 concerning the alleged improper mishandling of student evaluation forms and violation of confidentiality rules by another professor during the Fall 2008 semester. (Am. Compl. ¶ 71)

**Sanctions Phase of Hearing**

Although not specifically set forth in the Code of Conduct, it was the usual practice for the panel to ask for a recommendation regarding sanctions from a representative of the school or college in which the student was currently enrolled. (Am. Compl. ¶ 77) Plaintiff was currently enrolled in the Fox School of Business. However, Mr. Foley invited Dr. Luehrmann as Associate Dean of the College of Science and Technology (where Plaintiff was also taking classes), to make a recommendation. (Am. Compl. ¶ 78) Dr. Gumery questioned whether it was appropriate for Dr. Luehrmann to make the recommendation since she had been called by the University as a witness in the case, and Mr. Foley ruled that it was appropriate because "the courses do involved [sic] College of Science and Technology." (Am. Compl. ¶¶ 79-80)

Dr. Luehrmann then asked whether her "entire role" was "to give a recommendation, or to give any information?" (Am. Compl. ¶ 81) Plaintiff avers that after being told by Dr. Gumery that "any information relating to the case should have been given as a part of testimony," Dr. Luehrmann then remarked, "So history is not relevant?" (Am. Compl. ¶ 83) Ultimately, Dr. Gumery ruled that Dr. Luehrmann could make a recommendation concerning sanctions, as well as offer her own additional testimony in support of her recommendation. (Am. Compl. ¶ 84) Dr. Luehrmann went on to recommend that Plaintiff be dismissed from the University based upon the fact that she found the mass e-mails he sent out to all the students "to be a little hostile," and the fact that she discovered an inappropriate pattern of intimidation involving Plaintiff and Temple faculty, which appeared to be escalating. (Am Compl. ¶ 85)[3]

---

[3] Dr. Luehrmann testified that she was aware of at least nine different faculty members who had experienced some form of intimidation by Plaintiff while he attended classes at the University. (Am. Compl. ¶ 85)

**Sanctions**

On February 8, 2010, Defendant Andrea C. Seiss, then-Student Conduct Code Administrator for the University Disciplinary Committee, notified Plaintiff that based upon the findings of responsibility for violating Section 3 of the Student Code, Temple University was imposing a University Suspension lasting through August 15, 2010, CERT Track I (anger management classes), and probation lasting through graduation.  (Am. Compl. ¶ 87; Mot. Dismiss 5)  Furthermore, Plaintiff was advised that he remained responsible for payment of all tuition and fee charges "in accordance with payment information contained in University policy." (Am. Compl. ¶ 89; Mot. Dismiss 6)  Because the suspension was imposed after the course drop deadline for the Spring 2010 semester, Plaintiff received a non-passing grade of "WS" in all courses for which he had been registered.  (Am. Compl. ¶ 91) Ms. Seiss's letter also informed Plaintiff of his right to file an appeal.  (Am. Compl. ¶ 92; Mot. Dismiss 6)

**Appeal**

Plaintiff filed an appeal by letter, in which he asserted two procedural defects that he felt substantially prevented him from obtaining a full and fair hearing on the merits.  First, Plaintiff took issue with the fact that Dr. Krow did not participate in the hearing.  Secondly, Plaintiff complained of the fact that Dr. Luehrmann was able to give a recommendation.  (Am. Compl. ¶ 93)

Plaintiff's sanctions were held in abeyance while his appeal was pending but on March 12, 2010, Plaintiff was notified that the Appellate Board unanimously voted to uphold the original Board's finding of responsibility and sanctions.  (Am. Compl. ¶¶ 94, 96; Mot. Dismiss 6)  On March 18, 2010, after an e-mail inquiry from Plaintiff, Ms. Seiss advised him that no further appeal was available.  (Am. Compl. ¶ 98)

III.    **Discussion**

A.    **Standard of Review**

Defendants contend that Plaintiff has failed to state any claim upon which relief may be granted.  When assessing a motion brought pursuant to Fed. R. Civ. P. 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)(internal quotation and citation omitted).  As a result of the Supreme Court's decision in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, — U.S. —, 129 S.Ct. 1937, 1949 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).  This standard, which applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct. at 1949.

Specifically,

> Applying the principles of *Iqbal*, the Third Circuit in *Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009), articulated a two-part analysis that district courts in this Circuit must conduct in evaluating whether allegations in a complaint survive a Motion to Dismiss. First, the factual and legal elements of a claim should be separated, meaning "a District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210-11. Second, the Court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." *Id.* at 211. In other words, a complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. *Id.* (citing *Phillips*, 515 F.3d at 234-35). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'shown' - 'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1950. This "plausibility" determination under step two of the analysis is a "context-specific

12

task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

*Perano v. Twp. of Tilden*, No. 09-754, 2010 U.S. Dist. LEXIS 36781, at **15-17 (E.D. Pa. Apr. 12, 2010), *aff'd*, 2011 U.S. App. LEXIS 7655 (3d Cir. Pa., Apr. 13, 2011).

## B. Plaintiff's Claims[4]

## I. 42 U.S.C. § 1983: Violation of Procedural Due Process

Plaintiff first claims that he was entitled to due process regarding the disciplinary hearing because Defendants' actions were conducted under color of state law and their action of suspending Plaintiff deprived him of his constitutionally-protected property interest in his continued enrollment in the University, as well as future educational opportunities, employment opportunities, and his "good name and reputation." (Am. Compl. ¶¶ 109-113)

Preliminarily,

> The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law ." U.S. Const. Amend. XIV. To state a due process claim under § 1983, [a plaintiff] must identify a "recognized 'liberty or property' interest within the purview of the Fourteenth Amendment, and [show] that [they were] intentionally or recklessly deprived of that interest, even temporarily, under color of state law." *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990) (citations omitted), *cert. denied*, 498 U.S. 1040, 111 S. Ct. 712, 112 L. Ed. 2d 701 (1991).

*Anspach v. City of Philadelphia*, 503 F.3d 256, 262 (3d Cir. 2007).

Defendants do not dispute the fact that Temple University and its professors are state actors. *Manning v. Temple Univ.*, No. 03-4012, 2004 U.S. Dist. LEXIS 26129, at *19 (E.D. Pa.

---

[4] Plaintiff has opted to not address any of the legal bases presented in Defendants' Motion to Dismiss. Instead, he notes that "[e]xpending the time and effort necessary to refute legal propositions which have nothing to do with the viability of Osei's claims as set forth in the Amended Complaint would be a pointless exercise at this stage of the case and would do nothing to facilitate the Court's resolution of the matter at hand." (Resp. Mot. Dismiss 6) Therefore, Plaintiff has instead filed an eight-page discussion of federal pleading standards and urges this Court to rely upon his extensive Amended Complaint in support of denial of Defendants' Motion.

2004)(citing *Molthan v. Temple Univ.*, 778 F.2d 955, 961 (3d Cir. 1985)), *aff'd*, 171 Fed. App'x

509 (3d Cir. 2005). It is also true that a student's interest in pursuing or continuing an education

is included within the Fourteenth Amendment's protection of liberty and property and is

therefore entitled to some level of due process. *Goss v. Lopez*, 419 U.S. 565, 574 (U.S. 1975).

*See also Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988) (relying on *Goss* to

find that a student has a protected property interest in continuing education); *Ross v.*

*Pennsylvania State Univ.*, 445 F. Supp. 147, 152 (M.D. Pa. 1978) (stating that under

Pennsylvania law, a graduate student has a property interest protected by procedural due process

in the continuation of her course of study). Moreover, the Supreme Court has also recognized a

liberty interest and the need for procedural due process, "where a person's good name,

reputation, honor, or integrity is at stake because of what the government is doing to him." *Goss*,

419 U.S. at 574-75.

In addition to establishing deprivation of a property interest, Plaintiff's averments must

demonstrate that the procedural safeguards surrounding his suspension were inadequate.

*Manning*, No. 03-4012, 2004 U.S. Dist. LEXIS 26129, at **21-22 (citing *Bd. of Regents v. Roth*,

408 U.S. 564, 573 (U.S. 1972)). According to *Segal v. Temple Univ. Sch. of Law*, No. 99-3220,

1999 U.S. Dist. LEXIS 19073 (E.D. Pa. 1999), "Universities like Temple are entitled to establish

their own rules and regulations, including disciplinary proceedings, and the courts should

interfere only where it is clear that Constitutional rights have been infringed." *Id*. at *4 (citing

*Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1090 (8th Cir. 1969)). The basic elements of

due process in the school disciplinary setting require that a student facing suspension be given

some type of notice and an opportunity to be heard by a fair and impartial tribunal before any

deprivation of life, liberty, or property may occur. *Goss*, 419 U.S. at 579. *See also Sill v. Pa.*

*State Univ.*, 462 F.2d 463, 469 (3d Cir. 1972) (noting that the procedure required to afford due process of law is not of a fixed and invariable character but instead, "the requirements of due process frequently vary with the type of proceeding involved.") Beyond the minimum requirements, courts generally look to the particular situation to determine which procedures and safeguards the situation demands. *See e.g.*, *Gorman*, 837 F.2d at 14 (finding "[b]eyond the right to notice and hearing, the span of procedural protections required to ensure fairness becomes uncertain, and must be determined by a careful weighing or balancing of the competing interests implicated in the particular case.")

> Inasmuch as the instant suspension was for a period exceeding ten days . . .

> > The Court will apply the general procedural due process factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1975): First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substantive procedural requirement would entail.

*G.C. v. Bristol Twp. Sch. Dist.*, No. 05-4800, 2006 U.S. Dist. LEXIS 56108, at *8 (E.D. Pa. Aug. 10, 2006).

In specifically addressing due process in university disciplinary settings, the Third Circuit has held that there is no specific format the proceedings must follow, as long as the university provides sufficient due process protections. *Sill,* 462 F.2d at 469-70. Recently, this Court applied the three factors articulated in *Mathews* and reiterated the need for a fair and impartial tribunal in the university setting. *Furey v. Temple*, 730 F. Supp. 2d 380, 395 (E.D. Pa. 2010). In *Furey*, a full-time undergraduate Temple University student alleged violation of his procedural due process rights after the university disciplinary panel recommended that he be expelled for

violations of the Code of Conduct.[5] *Id*. at 382. Although the court found that departing from the Code of Conduct, preventing a right to counsel, preventing witness cross-examination, and the panel's failure to examine certain evidence could be considered due process violations *in certain situations*, they were not instrumental requirements of procedural due process in the student disciplinary context. *Id*. at 396. Instead, only "significant and unfair departures from an institution's own procedures can amount to a violation of due process." *Id*. at 396-97 (citing *Winnick v. Manning*, 469 F.2d 545, 550 (2d Cir. 1972)). In addressing the right to counsel and cross-examination of witnesses, the court found that neither are usually considered a necessary part of due process in the student disciplinary context, however "if an institution decides not to allow counsel or cross-examination to avoid an adversarial hearing, it must make sure that the hearing it does provide is fair and impartial." *Id*. at 398.

In the present case, Defendants concede that Plaintiff was entitled to due process protections in connection with his disciplinary hearing. The dispute arises over exactly *what level* of protection was necessary to satisfy due process under the 14th Amendment. Plaintiff argues that the procedures afforded to him were insufficient because he did not receive adequate notice of the charges against him, he was not given adequate opportunity to prepare to meet those charges, he had no right to be represented or heard by counsel, he had no right to confront his accusers, he had no right to cross-examine witnesses, he was not judged by a fair and impartial tribunal, and the University departed from the "usual practice" routinely utilized in the disciplinary proceedings. (Am. Compl. ¶ 115) However, Defendants maintain that the procedures utilized in Plaintiff's case satisfied the minimum requirements of due process in a university

---

[5] The disciplinary proceedings against Furey stemmed from his arrest for an altercation with a police officer within 500 yards of the Temple University campus and therefore involved a criminal charge component, which is absent from the instant case.

setting because they provided Plaintiff with notice and an opportunity to be heard. (Mot. to Dismiss 7)

### a.  Adequate Notice

As discussed above, due process requires that a student have adequate notice of the charges pending against him. In this case, Plaintiff's Amended Complaint clearly demonstrates that he was given both formal and informal notice of the charges against him. First, the Temple University Campus Police informed Plaintiff that although criminal charges were not being filed against him, a disciplinary hearing would be held by the University Disciplinary Committee. (Am. Compl. ¶ 45)  On January 10, 2010, Plaintiff was informed that his formal grievances were "placed on hold" because of pending disciplinary proceedings. (Am. Compl. ¶¶ 47-48)   Most importantly, on January 12, 2010, Plaintiff received formal written notice of the charges against him, including the specific section of the Code of Conduct he was charged with violating, a quote from the allegedly threatening e-mail sent to Dr. Krow, and instructions regarding the scheduling of  a pre-hearing meeting with a program coordinator. (Am. Compl. ¶¶ 49-52)  Furthermore, after attending the pre-hearing meeting on January 28, 2010, Plaintiff received another e-mail from Temple stating that the actual hearing would be held on February 3, 2010. The e-mail also disclosed the identity of the Chair of the hearing, and the witnesses the University planned to call at the hearing.  (Am. Compl. ¶¶ 54-55)

Plaintiff's due process claim is based largely on the fact that he was not informed of an additional witness the University intended to call until the day before his hearing, and that he was not given copies of the two additional e-mails referenced by the panel until the day of the hearing.  (Am. Compl. at ¶¶ 56-58)  Despite the fact that Plaintiff did not have the complete witness list or a complete list of the e-mails that would be referenced, Plaintiff was clearly on

reasonable notice of the charges pending against him. *See e.g.*, *Van Le v. Univ. of Med. & Dentistry*, 379 Fed. App'x 171, 175 (3d Cir. 2010) (finding notice adequate despite the introduction of evidence of other related incidents, because the student was aware of the other information).

As for Plaintiff's claims that he did not have an adequate opportunity to prepare for the pending charges, there is no allegation that he ever requested a continuance or a delay to have more time to prepare for the hearing, or that Temple would not have granted a delay, had they known Plaintiff did not feel adequately prepared. *See e.g.*, *Furey v. Temple Univ.*, 730 F. Supp. 2d at 398 (declining to grant summary judgment in favor of University because the denial of continuance to locate witnesses may raise a question in due process under certain circumstances); *Van Le*, 379 Fed. App'x at 174 (finding several days to prepare a defense adequate because it was undisputed that student was educated and capable).

In view of the foregoing, the notice afforded to Plaintiff was adequate.

**b.      Opportunity to Be Heard, Including the Right to Counsel, Right to Confront Accuser & Right to Cross-Examination**

In the university disciplinary context, the right to counsel, the right to confront witnesses, and the right to cross-examine witnesses generally have not been deemed necessary elements of due process of law. *Furey,* 730 F. Supp. 2d at 397. *See also Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005) (applying *Goss* and *Mathews* and concluding that counsel was unnecessary for hearings that are "not procedurally complex and that cross-examination would have added no value" to the proceeding.); *Murakowski v. Univ. of Del.*, 575 F. Supp. 2d 571, 585 (D. Del. 2008) (recognizing "the right to a hearing does 'not imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required.' Due process is satisfied 'by way

of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures.'")(quoting *Esteban v. Central Missouri State College,* 415 F.2d 1077, 1089 (8th Cir. 1969)).

Preliminarily, this Court notes that an attorney did accompany Plaintiff to the hearing as his "advisor." (Am. Compl. ¶ 57) That aside, Plaintiff was not facing any criminal charges for the e-mails to Dr. Krow, and he was assured of that fact when he inquired with the Temple Police Department. (Am. Compl. ¶ 45) There is no allegation that the hearing involved any procedurally complex issues that would require the presence of counsel or additional protections, nor did counsel represent the University at the hearing. Furthermore, Plaintiff was given formal written notice of the charges against him, he scheduled and attended a pre-hearing meeting to discuss the actual hearing, and was able to speak in his own defense and submit character letters to rebut the charges. (Am. Compl. ¶¶ 49, 52, 57, 72, 74) The procedures utilized in this case provided Plaintiff with adequate due process protections, despite his inability to cross-examine Dr. Krow or other University witnesses, since he was able to submit his own evidence, give his side of the story, and submit a timely appeal. *See e.g.*, *Tasby v. Estes*, 643 F.2d 1103, 1106 (5th Cir. 1981) ("rights in a student disciplinary hearing may properly be determined upon the hearsay evidence of school administrators who investigate disciplinary infractions."); *Murakowski*, 575 F. Supp. 2d at 584-87 (finding due process satisfied despite the fact that the hearing officer relied on double hearsay because the student was given "adequate notice of the charge and grounds, the opportunity to participate in the hearing, and an opportunity to present one's own side of the case through his own statements and statements of witnesses.").

### c.        **Impartial Tribunal**

Plaintiff further claims that he was denied due process because he was "judged" by Dr. Luehrmann. In making this claim, he alleges that by inviting a faculty member (Dr. Luehrmann) who was not associated with the school in which Plaintiff was enrolled, the University departed from its Code of Conduct, which in turn deprived him of his right to procedural due process. (Am. Compl. ¶ 115(g)-(h))

In *Furey*, the Third Circuit addressed Temple University's departure from the student Code of Conduct and concluded that a school's failure to follow its own policies is not, in itself, a violation of due process but instead, only *significant and unfair departures* can amount to a violation. *Id*. 730 F. Supp. 2d at 396-397 (citing *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972) (emphasis added).  In Plaintiff's case, the University did acknowledge that their usual practice was to ask for a recommendation from the school the student was attending, but also stated that the practice was not set forth in the Student Code of Conduct. (Am. Compl. ¶ 77)  In fact, Plaintiff does not cite to any specific provision of the Code regarding this particular allegation.  Even if Plaintiff  could prove that it was the official policy of the University to obtain recommendations from a faculty member who is associated with the college or school in which the student is enrolled, the departure could hardly be classified as a "significant" or "unfair" departure, as Plaintiff was enrolled in courses at the College of Science and Technology, where Dr. Luehrmann served as  the Associate Dean.  (Am. Compl. ¶ 78)  Given all the protections discussed above, the University's departure from its "usual practice" does not amount to a deprivation of due process.

Plaintiff further alleges that Dr. Luehrmann already had pre-conceived notions about him and displayed animosity toward him, therefore allowing her to testify, "judge," and recommend

sanctions, deprived him of a fair and impartial panel. (Am. Compl. ¶ 115.) Specifically, Plaintiff complains of personal knowledge Dr. Leuhrmann possessed regarding other conduct for which Plaintiff was not charged. (Am. Compl. ¶ 115)

There is a presumption of fairness in administrative proceedings which favors administrators and "alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." *Gorman*, 837 F.2d at 15 (citing *Duke v. North Texas State Univ.*, 469 F. 2d 829, 834 (5th Cir. 1972). *See also Van Le*, 379 Fed. App'x at 174 (due process was not violated by consideration of past instances); *Manning*, 2004 U.S. Dist. LEXIS 26129, at **22-23 ("Procedural safeguards are adequate if the student is notified of her impending dismissal, if the student can engage in an 'informal give-and-take' with the administrative body dismissing her, and if the decision to dismiss the student is 'careful and deliberate.'") (quoting *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84-85 (1978)).

Plaintiff's Amended Complaint makes the bald assertion that Dr. Leuhrmann participated in the hearing as a judge when in fact, all other relevant allegations within said Complaint demonstrate otherwise. Clearly, Dr. Luehrmann's testimony was used for the same purpose as Plaintiff's: fact-finding. Moreover, although Dr. Leuhrmann made a recommendation of sanction, *the Board declined to follow same and instead, imposed a less harsh sanction*. (Am. Compl. ¶¶ 84-87) Under the circumstances, Dr. Leuhrmann's participation in the process did not violate Plaintiff's right to a fair and impartial proceeding. *See e.g.*, *Manning*, 2004 U.S. Dist. LEXIS 26129, at *24 (finding that a professor's double role as advocate and member of the dismissal committee did not constitute a violation of procedural due process because the final arbiter was made fully aware of "any potential taint in the proceeding" and was able to weigh the

professor's actions against the evidence, and the decisions of the committee were "only advisory to him). The fact that Plaintiff had previous interactions with Dr. Luehrmann is also insufficient to overcome the presumption of fairness in the disciplinary proceedings. *See e.g.,Gorman*, 837 F.2d at 15 (finding that "in the intimate setting of a college or university, prior contact between the participants is likely, and does not per se indicate bias or partiality"); *Alex v. Allen*, 409 F. Supp. 379, 388 (W.D. Pa. 1976) (stating that "to a certain extent, the federal courts must rely on the discretion, honor, and good judgment of school officials. The only alternative is to accord a right to appeal all suspensions to the federal courts -- a process which would overwhelm the already crowded court dockets.") Just as importantly, the other protections afforded to Plaintiff during the proceeding, including his ability to have counsel present, the opportunity to rebut the testimony of the witnesses, and the holding of his sanction in abeyance pending appeal, all demonstrate the existence of adequate due process protection in a university disciplinary setting.

### d. *Mathews Factors*

In sum, even after accepting all of the factual allegations in Plaintiff's Amended Complaint as true, Plaintiff has failed to allege sufficient facts to support the inference that Defendants violated his right to due process in connection with his disciplinary hearing and ultimate suspension. Plaintiff did have a private interest in pursuing his education, which was affected by the suspension. However, this Court finds no "erroneous deprivation" of said interest by reason of the procedures utilized by Defendants. Instead, based upon the averments set forth in Plaintiff's Amended Complaint, it is quite apparent that under the circumstances, Plaintiff was afforded additional procedural safeguards. Moreover, by his own admission, Plaintiff conceded that the "intended" use of the words contained within his e-mails to Dr. Krow might not have come across properly and he apologized for the troublesome nature of the language. (Am.

Compl. ¶¶ 72-73) As such, the University can hardly be faulted for upholding its interest in maintaining what it perceived to be a potential threat to the safety of its faculty. Additionally, inasmuch as this matter did not involve criminal charges, the University should not be expected to incur the cost of conducting an unnecessary and more formal adversarial proceeding.

Accordingly, Count I of Plaintiff's Amended Complaint shall be dismissed.

## ii. Violation of Substantive Due Process Claim

Plaintiff next avers that by enacting and enforcing Section 3 of the Student Code of Conduct, which prohibits "any act or threat of intimidation or physical violence toward another person including actual or threatened assault and battery," Defendants committed an arbitrary and deliberate abuse of law because Section 3 unjustifiably restricts and impairs the fundamental rights of freedom of expression and association of all the students. (Am. Compl. ¶¶ 121-22) Plaintiff further asserts that Section 3 is vague and overbroad in its scope. (Am. Compl. ¶¶ 123-24) Defendants rebut these claims, arguing that Section 3 does not impair the fundamental right to freedom of speech because it only regulates "true threats," which are not protected by the First Amendment. (Mot. to Dismiss 14-15)

The Fourteenth Amendment's guarantee of "due process of law" includes a substantive component, which forbids the government from infringing upon certain "fundamental" liberty interests unless the infringement is narrowly tailored to serve a compelling state interest. *Reno v. Flores*, 507 U.S. 292, 301-302 (U.S. 1993). Additionally,

> When a plaintiff challenges a non-legislative state action (such as an adverse employment decision), [the court] must look, as a threshold matter, to whether the property interest being deprived is "fundamental" under the Constitution. If it is, then substantive due process protects the plaintiff from arbitrary or irrational deprivation, regardless of the adequacy of procedures used. If the interest is not "fundamental," however, the governmental action is entirely outside the ambit of substantive process and will be upheld so long as the state satisfies the requirements of procedural due process.

*Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000). *See also*, *Manning*, 2004 U.S. Dist. LEXIS 26129, at *20-21 (substantive due process rights prohibit those acting under color of state law from taking away a person's property interest for reasons that are "arbitrary, irrational, or tainted by improper motive.").

Accordingly, in order for Plaintiff to state a meritorious claim for violation of substantive due process, he must first establish that the speech regulated in Section 3 of the Code of Conduct is protected by the First Amendment, and is therefore considered a fundamental right under the Constitution. Plaintiff must then demonstrate that the deprivation of the right was arbitrary or capricious.

### a.  Freedom of Speech

It is undisputed that the First Amendment's freedom of speech and association is considered a fundamental right inside and outside of school. *See e.g., Tinker v. Des Moines Indep. Cnty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  To that end,

> The Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Saxe*, 240 F.3d at 215, 240 F.3d at 215; *see Papish*, 410 U.S. at 670; *Tinker*, 393 U.S. at 509; *Sypniewski*, 307 F.3d at 259 n.16. While "[t]he precise scope of *Tinker's* interference with the rights of others' language is unclear" it is "certainly not enough that the speech is merely offensive to some listener." *Saxe*, 240 F.3d at 217, 240 F.3d at 217.

*McCauley v. University of the Virgin Islands*, 618 F.3d 232. 251 (3d Cir. 2010).

However, it is equally undisputed that the right of free speech " is not absolute" and certain classes of speech may be regulated, or even punished, by government without violating the Constitution. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571(1942). Specifically, speech that is "likely to cause or inflict unacceptable harm" such as "true threats," shall not be protected by the First Amendment.  *Murakowski v. Univ. of Del.,* 575 F. Supp. 2d at 588-89 (citing *Watts*

*v.United States*, 394 U.S. 705, 708 (1969)).  *See also Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001) ("there is no question that non-expressive, physically harassing conduct is entirely outside the ambit of the free speech clause.").

As Defendants correctly note, the Supreme Court has defined "true threats" as follows:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *See Watts v. United States, supra*, at 708 ("political hyberbole" is not a true threat); *R. A. V. v. City of St. Paul*, 505 U.S., at 388. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protects individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." *Ibid.* Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Virginia v. Black*, 538 U.S. 343, 359-360 (U.S. 2003).

In *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367 (9th Cir. 1996), a 10th grade student was suspended after she allegedly threatened to shoot a school guidance counselor because she could not effectuate changes to her class schedule. *Id*. at 368.  The court concluded that:

> Threats of physical violence are not protected by the First Amendment under either federal or state law, and as a result, it does not matter to our analysis that [Plaintiff] uttered her comments while at school. To resolve the federal claim, we need not rely upon the Supreme Court cases that limit students' free speech rights; because we hold that ***threats such as [Plaintiff's] are not entitled to First Amendment protection in any forum***, it does not matter that the statement was made by a student in the school context. Thus, our analysis focuses upon whether [the School District] could punish [Plaintiff] based on her statement, without violating her First Amendment free speech rights, regardless of whether the conduct occurred on or off campus.

*Lovell,* 90 F. 3d at 371 (emphasis added).

In order to make this determination, the court employed the following standard:

> We have set forth an objective test for determining whether a threat is a "true threat" and, thus, falls outside the protection of the First Amendment: "whether a reasonable person would foresee that the statement would be interpreted by those

to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Orozco-Santillan*, 903 F.2d 1262 (9th Cir. 1990). Furthermore, "alleged threats should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners." *Id.*

*Id.* at 372.

Applying this standard, it was ultimately determined that a reasonable person in the student's position would have foreseen that the counselor would interpret the statement, "If I don't get this schedule change, I am going to shoot you," as a serious expression of intent to harm or assault. *Id*.[6]

In the present case, several e-mail statements are at issue. Namely, " It will be a curse against your life and family forever . . . you are free if you make a mends [sic]," "I want justice on you physically and spiritually," and "Your game is over mine begins, you played with the wrong person this time." As noted hereinabove, Section 3 forbids "acts or threats of intimidation or physical violence toward another person." This Court finds that the University properly determined that the contents of Plaintiff's e-mails constituted "true threats," as any reasonable person in Plaintiff's position should have foreseen that Dr. Krow would interpret these statements as a serious intent to inflict harm. The University was further justified in categorizing Plaintiff's speech as a "true threat," given the conditional nature of the statements, the fact that Plaintiff directly contacted Dr. Krow, the clearly apparent anger displayed by Plaintiff, and the intimidation Dr. Krow felt, as evidenced by the fact that he forwarded the e-mails to both the department head and University Police.

The University's actions in punishing Plaintiff's speech after looking at the context and determining it constituted a "true threat," cannot be described as arbitrary or capricious. This

---

[6] This standard has in fact been applied in a University setting by our sister court in Delaware. *See Murakowski*, 575 F. Supp. 2d 571 at 590.

finding, coupled with those set forth above, clearly establish that the University's actions did not run afoul of Fourteenth Amendment substantive due process.

### iii.    Vagueness & Overbreadth

Plaintiff further alleges that Section 3 of the Student Code of Conduct is impermissibly vague and overbroad in its scope because it does not define "intimidation" or "threat of intimidation," and it unnecessarily impairs his freedoms and interests as a student. (Am. Compl. ¶¶ 123-124.)

### a.    Vagueness

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (U.S. 1972). A vague rule "may authorize and even encourage arbitrary and discriminatory enforcement, by failing to 'establish minimal guidelines to govern . . . enforcement.'" *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 266 (3d Cir. 2002) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).

The Third Circuit has declared that the "void for vagueness" rule applies to Codes of Conduct that regulate the behavior of students in the University setting . . .

> It is true that a prohibitory law of a state which is so vague as to require speculation as to its meaning runs afoul of the Fourteenth Amendment and that this rule extends to rules regulating the conduct of students in educational institutions chartered or supported by the state. *Soglin v. Kauffman*, 7 Cir. 1969, 418 F.2d 163. *See Tinker v. Des Moines, Independent Community School Dist.*, 1969, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731, and *Keyishian v. Board of Regents of New York*, 1967, 385 U.S. 589, 87 S. Ct. 675, 17 L. Ed. 2d 629. ***It is also true, however, that codes of conduct prescribed for students by educational institutions are not required to satisfy the same rigorous standards in this regard as are criminal statutes***. *Soglin v. Kauffman*, 7 Cir. 1969, 418 F.2d 163, 168. ***For student discipline is not analogous to criminal prosecution.***

*Sill v. Pennsylvania State University*, 462 F.2d 463, 467 (3d Cir. Pa. 1972)(emphasis added).

*See also Alex v. Allen,* 409 F. Supp. 379, 384 (W.D. Pa. 1976) (noting that "all courts seem to

agree that the same specificity is not required in college rules as is necessary in criminal statutes"

(citing *Sword v. Fox*, 446 F.2d 1091, 1099 (4th Cir. 1971)); *Esteban v. Central Missouri State*

*College*, 415 F.2d 1077, 1089-1090 (8th Cir. Mo. 1969) (holding that a college has the power to

promulgate regulations and expect that students adhere to the standards of conduct prescribed,

and that flexibility and elbow room are preferred over specificity). Thus, a school regulation is

not unconstitutionally vague, provided an individual of ordinary intelligence would be on notice

that certain behavior could put them at risk for disciplinary action, and would not have to guess

at the regulation's meaning and application. *Grayned*, 408 U.S. 104, 108 (U.S. 1972).

Furthermore, school regulations will only be struck down when the vagueness is especially

problematic. *Sypniewski*, 307 F.3d at 266.  Such is not the case herein.

### b.    Overbreadth

A regulation is unconstitutional on its face on overbreadth grounds where there is "a

likelihood that the statute's very existence will inhibit free expression" by "inhibiting the speech

of third parties who are not before the Court." *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200,

214 (3d Cir. 2001) (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799

(1984)). To render a law unconstitutional, the alleged overbreadth must be "not only real but

substantial in relation to the statute's plainly legitimate sweep." *Id*. (quoting *Broadrick v.*

*Oklahoma*, 413 U.S. 601, 615 (1973)).  The Third Circuit has noted that the overbreadth doctrine

may be applied to Student Codes of Conduct in the school setting. *See DeJohn v. Temple Univ.*,

537 F.3d 301, 313 (3d Cir.  2008) (striking down Temple University's sexual harassment policy

as overbroad because the Policy "punished speech that merely intends to harass.").

However, in *Furey v. Temple University*, 730 F. Supp. 2d 380, 395 n.15 (E.D. Pa. 2010), our District determined that any allegation that Section 3 of Temple University's Student Code of Conduct was unconstitutionally vague and overbroad on its face would fail because "Codes of Conduct for students do not have to satisfy the same standards for clarity as criminal statutes." *Id.*[7]

Section 3 of the Student Code of Conduct directly states that the prohibited conduct includes "act or threats of intimidation," and sufficiently puts students on notice of the prohibited conduct. For purposes of further clarification, the Code provides an example of the prohibited conduct by adding the phrase, "including actual or threatened assault and battery." (Am. Compl. ¶ 122) Accordingly, Plaintiff's vagueness an overbreadth challenges lack merit and Count II of his Amended Complaint must be dismissed.

### iv.    First Amendment

### a.    Retaliation

Next, Plaintiff alleges that his suspension was in reaction to the mass e-mail he sent to other students and that Dr. Luehrmann's recommendation and sanctions were in retaliation for said e-mails, as well as other protected speech. (Am. Compl. ¶ 132)

To sustain an action for retaliation under the First Amendment, Plaintiff must prove that his constitutionally protected conduct was a "substantial" or "motivating factor" in the University's decision to suspend him. *See Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 144 (3rd Cir. 2000) (citing *Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (U.S. 1977)). *See also Furey v. Temple Univ.*,730 F. Supp 2d at 401 ("In order to maintain a retaliation claim, a plaintiff must show the exercise of a constitutionally protected activity and that the activity was a substantial factor in the alleged retaliatory action.")(citing *Hill v. City of Scranton*, 411 F.3d 118,

---

[7] The court did not elaborate on the issue because the Plaintiff failed to properly raise it in his Complaint. However, the court's ultimate finding is pertinent to the instant action.

125 (3rd Cir. 2005)).  However, a defendant is able to defeat a First Amendment retaliation claim by demonstrating that they would have taken the same actions in the absence of the protected speech.  *Kovac v. Pa. Tpk. Comm'n,* No. 10-4730, 2011 U.S. App. LEXIS 18960, at *6 (3d Cir. Pa. Sept. 13, 2011).

In applying the standard to the present case, Plaintiff has failed to adequately satisfy the second factor, as he has not pled sufficient facts that could demonstrate that the suspension was motivated by the mass e-mails.  Plaintiff sent the mass e-mails to the students on December 18, 2009, prior to sending the series of "threatening" e-mails to Dr. Krow, which didn't begin until December 20, 2009. (Am. Compl. ¶¶ 24-27) Plaintiff was warned by the Police department to stop e-mailing Dr. Krow only after sending his December 22, 2009 e-mail directly to Dr. Krow, and in his meeting with Dr. Levis and Dr. Strongin, Dr. Levis only referenced the allegedly "threatening" e-mails that were sent to Dr. Krow and made no mention of the mass-emails sent to the students. (Am. Compl. ¶¶ 38-44)  Furthermore, the Notice of Disciplinary Action specifically cited "threatening emails to Dr. Grant Krow in reference to receiving a poor grade" as the basis for the disciplinary hearing. (Am. Compl. ¶ 51) Similarly, the two additional e-mails that were handed to Plaintiff  prior to the hearing were those which Plaintiff sent directly to Dr. Krow. (Am. Compl. ¶ 58)  The only time that the mass e-mails were even mentioned, was when Dr. Luehrmann recommended sanctions against Plaintiff, and even then, the University declined to follow her recommendation. (Am. Compl. ¶ 85) Assuming *arguendo* that the University had decided to follow Dr. Luehrmann's  recommendation, none of the facts alleged in Plaintiff's Amended Complaint support the inference that the mass e-mails were a "substantial" or "motivating factor," which is required to sustain a First Amendment retaliation claim. Accordingly, Plaintiff's First Amendment retaliation claim on this basis fails.

### b.    Discrimination

In addition to his allegations regarding the mass e-mails, Plaintiff further alleges that he was discriminated against on the basis of points of view expressed in the content of his protected speech. (Am. Compl. ¶ 133)

A regulation is considered content-based, and subject to strict scrutiny, when speech or expressive content is proscribed because of the disapproval of the ideas expressed. *See e.g.*, *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (U.S. 1992) (finding an ordinance facially unconstitutional because it only restricted "fighting words" that "insult or provoke violence on the basis of race, color, creed, or gender," and "fighting words" connected with other ideas were not covered). On the other hand, "content-neutral" speech restrictions proscribe classes of speech without reference to the content of the regulated speech. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771 (U.S. 1976).  Section 3 of the Code in this case makes no reference to any content-based criteria; it references acts or threats or intimidation or physical violence toward another person.  As such, said provision must therefore be considered content-neutral.

In view of the foregoing, Plaintiff's various allegations of First Amendment violations. Plaintiff's Amended Complaint clearly demonstrates that the "threatening" e-mails he sent to Dr. Krow were the "motivating factor" that led to his suspension; not the mass e-mails.   Furthermore, Section 3 of the Code is a content-neutral regulation that does not implicate constitutionally-protected speech and is justified by the University's interests in keeping their students and faculty safe from threats of physical violence. Accordingly, Count III of Plaintiff's Complaint must be dismissed.

**v.      42 U.S.C. § 1981: Intentional Discrimination on the Basis of Race or National Origin**

Plaintiff next alleges that all of the defendants, individually and collectively, intentionally discriminated against him on the basis of his race (African), and national origin (Republic of Ghana) in the assessment, institution, investigation, prosecution, and imposition of sanctions during the disciplinary proceeding. (Am. Compl. ¶ 139) Furthermore, Plaintiff alleges that said Defendants denied him the enjoyment of the rights and reasonable expectations of a student because of his race and national origin, and because of suspicion and mistrust of his motivations based on false stereotypes concerning his cultural and moral background.  (Am. Compl. ¶ 139)

As the court in *Manning v. Temple Univ.*, 2004 U.S. Dist. LEXIS 26129 (E.D. Pa. Dec. 30, 2004) recognized,

> In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), the United States Supreme Court outlined the formula for making out a prima facie case of race discrimination in employment. ***This formula has been adapted for the educational context*** and requires the plaintiff to prove that "(1) she is a member of a protected class; (2) she suffered an adverse action at the hands of the defendants in her pursuit of her education; (3) she was qualified to continue in her pursuit of her education; and (4) she was treated differently from similarly situated students who are not members of the protected class." *Bell v. Ohio State Univ.*, 351 F.3d 240, 252-53 (6th Cir. 2003).

*Id.* at *15 (emphasis added).

In the instant case, Plaintiff has failed to allege <u>any</u> facts supporting an inference that Defendants discriminated on the basis of race or national origin.  Plaintiff's Amended Complaint is similarly devoid of <u>any</u> facts that could establish an intent to discriminate by Defendants, which is a required element of the § 1981 claim. Plaintiff's allegation is nothing more than a bald accusation of race or national origin discrimination that cannot be sustained. Accordingly, Count IV of Plaintiff's Amended Complaint shall be dismissed.

### vi.  42 U.S.C. § 1985(3): Conspiracy to Deprive Civil Rights

The Fifth Count of Plaintiff's Complaint alleges that all Defendants, "conspired to deprive

him of the due process and equal protection of the laws and/or his other civil rights and engaged

in acts in furtherance of the conspiracy, which resulted in injury to him," in violation of 42 U.S.C.

§ 1985(3).  (Am. Compl. ¶ 141)

42 U.S.C. § 1985(3) provides a remedy against those who conspire to deprive another of

his or her civil rights.[4]  In order to state a claim under §1985(3) , a plaintiff must adequately allege

four elements:

> (1) [A] conspiracy; (2) motivated by a racial or class-based discriminatory animus
> designed to deprive, directly or indirectly, any person or class of persons to the
> equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an
> injury to the person or property or the deprivation of any right or privilege of a
> citizen of the United States.

*Herring v. Chichester Sch. Dist.,* No. 06-5525, 2007 U.S. Dist. LEXIS 82571, at **33-34 (E.D.

Pa. Nov. 6, 2007) (citing *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997)).

"A conspiracy claim based upon § 1985(3) requires a clear showing of invidious,

purposeful and intentional discrimination between classes or individuals." *Robinson v. McCorkle*,

462 F.2d 111 (3d Cir. 1972).  *See also Farber v. City of Paterson*, 440 F.3d 131, 135 (3d Cir.

2006) (explaining that the second element of §1985(3) requires "a plaintiff to allege both that the

conspiracy was motivated by discriminatory animus against an identifiable class and that the

---

[4] The statute reads in relevant part:

> If two or more persons … conspire … for the purpose of depriving, either directly
> or indirectly, any person or class of persons of the equal protection of the laws, or
> of equal privileges and immunities under the laws … the party so injured or
> deprived may have an action for the recovery of damages occasioned by such
> injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

discrimination against the class was invidious.") (citing *Aulson v. Blanchard*, 83 F.3d 1, 4-5 (1st Cir. 1996)). "To withstand a motion to dismiss, a Complaint alleging a civil rights conspiracy should identify with particularity the conduct violating plaintiff's rights, the time and place of the actions, and the people responsible therefor." *Boddorff v. Publicker Indus. Inc.*, 448 F. Supp. 1107, 1112 (E.D. Pa. 1980) (citing *Hall v. Pa. State Police*, 570 F.2d 86 (3rd Cir. 1978)). In this case, Plaintiff's Amended Complaint lacks any specific allegations of a conspiracy amongst the defendants, but instead, claims only that "all of the defendants have conspired to deprive [him] of the due process and equal protection of the laws." (Am. Compl. ¶ 141) "Courts have nearly unanimously required more than conclusory allegations of deprivations of constitutional rights." *Robinson*, 462 F.2d at 113 (collecting cases). *See also Herring*, 2007 U.S. Dist. LEXIS 82571 at *32 (finding that the Plaintiff's § 1985(3) claim must be dismissed because it contained nothing more than conclusory statements that the defendants conspired, without alleging any facts to demonstrate a conspiracy).

Since Plaintiff has failed to allege the first prong of the §1985(3) claim regarding specific averments of a conspiracy, this Court need not assess the remaining elements of the claim and Count V of Plaintiff's Amended Complaint is accordingly dismissed.

### vii. 42 U.S.C. § 1986: Neglect to Prevent Conspiracy

Next, Plaintiff alleges that all of the Defendants violated § 1986[5], in that "they all had

---

[5] 42 U.S.C. § 1986 provides in pertinent part that:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented . . .

knowledge that the wrongs conspired to be done were about to be committed, had the power to prevent or to aid in preventing the commission of the same and neglected to do so, even though the wrongs which were committed could have been prevented by the exercise of reasonable diligence." (Am. Compl. ¶ 143)

"Because transgressions of § 1986 by definition depend on a preexisting violation of § 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail also." *Rogin v. Bensalem Township*, 616 F.2d 680, 696 (3d Cir. 1980). *See also Grimes v. Smith*, 776 F.2d 1359, 1363 n. 4 (7th Cir. 1985) ("Liability under § 1986 is derivative of § 1985(3) liability; without a violation of § 1985(3), there can be no violation of § 1986."); *Koorn v. Lacey Twp.*, 78 Fed. App'x 199, 208 (3d Cir. 2003) ("Without a cognizable § 1985(3) claim, a claim for violation of § 1986 must also fail").

Accordingly, since Plaintiff has failed to adequately allege a conspiracy under § 1985(3), his § 1986 claim is rendered moot.

### viii. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d

In Count Seven of his Amended Complaint, Plaintiff alleges that Temple University engaged in intentional discrimination against him on the basis of race and/or national origin, in violation of 42 U.S.C. § 2000d. (Am. Compl. ¶ 147)

In *Manning*, the plaintiff alleged race discrimination claims against all defendants in violation of 42 U.S.C. § 1981, Title VI of Civil Rights Act 42 U.S.C. § 2000d, and Pennsylvania state laws. *Id.* at *14. The court held that "whether a plaintiff has made out a claim for racial discrimination is essentially the same whether the claim is brought under § 1981, Title VI or the PHRA." *Id. See also Pryor*, 288 F.3d at 569 (3d Cir. 2002) (stating that the standard for establishing an "intent to discriminate on the basis of race is identical in the Title VI and § 1981

contexts.").

Applying the same standard that was applied when analyzing Plaintiff's § 1981 claim, Count VII of Plaintiff's Amended Complaint must similarly be dismissed.

### ix.      Supplemental Jurisdiction

Inasmuch as Plaintiff's Amended Complaint fails to sufficiently allege any federal claim upon which relief can be granted, this Court declines to exercise supplemental jurisdiction over the remaining state claims.  *See* 28 U.S.C. § 1367(c)(3) (discretion to decline supplemental jurisdiction when all claims over which court had original jurisdiction have been dismissed).

**IV. Conclusion**

For the reasons set forth hereinabove, Counts One through Seven of Plaintiff's Amended Complaint are hereby dismissed with prejudice.  Inasmuch as: (1) Plaintiff has already been granted the opportunity to amend his Complaint; (2) Plaintiff has done so, apparently leaving no fact unstated; and (3) further amendment would be futile, the instant dismissal is with prejudice. Additionally, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state claims.

An appropriate Order follows.